ANDREW MANCILLA
ROBERT M. FANTONE
Mancilla and Fantone, LLP
260 Madison Avenue, 22nd Floor
New York, New York 10016
Phone: 646-225-6686
Fax: 646-655-0269
Email: andrew@law-mf.com

Counsel for Defendant Karim Baratov

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:17-CR-103 VC |
| Plaintiff, | |
| v. | |
| | Sentencing Date:  April 24, 2018 |
| KARIM BARATOV, | Time:         10:30 a.m. |
| | Court:        Honorable Vince Chhabria |
| Defendant. | |

---

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF SENTENCING**

---

1

## <u>TABLE OF CONTENTS</u>

2  **I. PRELIMINARY STATEMENT**........................................................................  **3**

3  **II. DISCUSSION**...............................................................................................  **3**

4      **A.**    **LEGAL STANDARD**...........................................................  **3**

5      **B.**    **FACTUAL BACKGROUND**...................................................  **4**

6      **C.**    **GUIDELINES CALCULATION**..........................................  **5**

7          **i.**    **Stipulated Guidelines**...........................................  **5**

8          **ii.**    **Probation Department's Recommended Sentence**............................  **6**

9          **iii.**    **Government's Recommended Sentence**...............................................  **6**

10          **iv.**    **Defendant's Requested Sentence**........................................  **6**

11      **D.**    **DEFENDANT'S RECOMMENDED SENTENCE UNDER THE 'SHADOW GUIDELINES'**.....................................................  **6**

12

13      **E.**    **THE NEED TO AVOID DISPARITY IN TREATMENT OF SIMILARLY SITUATED DEFENDANTS**...............................  **15**

14      **F.**    **MR. BARATOV'S HISTORY AND CHARACTERISTICS**........................  **20**

15  **III. CONCLUSION**..........................................................................................  **33**

16

17

18

19

20

21

22

23

24

25

# I.

## PRELIMINARY STATEMENT

Mr. Baratov is a 23-year-old young man who will stand before Your Honor to be sentenced on April 24, 2018 for hacking. Hacking began for Mr. Baratov as a curiosity. But his curiosity got the best of him. His interest in coding became a skillset, and his skillset unintentionally led him to money. He bore no intent to cause harm. He sincerely regrets his actions. This is a hard lesson to learn for a young man of Mr, but it is a lesson he has learned. Criminal activity will not reoccur. Incarceration is unnecessary for specific deterrence. Neither Mr. Baratov nor the community would be well served by a lengthy prison sentence. A shorter sentence below the guidelines is more appropriate for this young man.  For the reasons articulated below, the Defendant respectfully requests the Court impose a sentence of 45 months (the low end of the Shadow Guidelines range, plus 2 years consecutive), 3 years supervised release, and no restitution.

# II.

## DISCUSSION

### A.  __LEGAL STANDARD__

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." This "parsimony clause" applies at every federal sentencing and defines the Court's "overarching duty." *Pepper v. United States*, 131 S. Ct. 1229, 1243 (2011).

In determining a sentence that is "sufficient, but not greater than necessary," the first of those factors the judge must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. §3553 (a)(1). Without a doubt, the breadth of this factor alone extends far beyond the guidelines and implores the sentencing judge to consider the unique circumstances and characteristics of the defendant in each case. It is the sentencing judge who has the

1    advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a)

2    factors. *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) (*citing Gall v. United States*, 128 S.

3    Ct. 586, 597 (2007)) Importantly, the Court must also consider "the need to avoid unwarranted

4    sentence disparities among [similarly situated] defendants." *United States v. Garcia-Renteria*, 298 F

5    App'x 552, 554 (9th Cir 2008)(*citing* 18 U.S.C. § 3553(a)(6))

6    **B.    FACTUAL BACKGROUND**

7         Mr. Baratov was arrested on March 14, 2017 in Canada at the age of 22 years old.  On August

8    22, 2017 Mr. Baratov waived extradition from Canada and was transported to the United States.  On

9    November 28, 2018, Mr. Baratov pled guilty to one count of conspiracy to commit computer fraud in

10   violation of 18 U.S.C. § 1030(b) (Count One) and seven counts of aggravated identity theft in

11   violation of 18 U.S.C. § 1020A (Count Forty through Forty-Seven).

12        The basis for Mr. Baratov's plea was his agreed involvement with co-defendant Dmitry

13   Dokuchaev to obtain passwords to access the Google Mail ("Gmail") accounts of eight individuals

14   Dokuchaev requested.  As detailed in the plea agreement and the Probation Department's PSR and

15   plea agreement, during the period of time Mr. Baratov committed the criminal offenses, he was

16   unaware of the true identity of Dokuchaev, being familiar only with Dokuchaev's online alias

17   "Patrick Nag."  PSR at ¶12. Additionally, Mr. Baratov was never informed that Dokuchaev or any of

18   the other co-defendants participated in the hack of Yahoo as described in the Indictment, nor that the

19   email accounts Dokuchaev asked Mr. Baratov to gain access to were derived from the co-defendants'

20   hack of Yahoo.  Thus, with respect to the narrative of criminal activity contained in the Indictment,

21   Mr. Baratov's minimal involvement was limited to obtaining passwords to eight accounts at the

22   request of an individual he knew to be "Patrick Nag."[1]

23

24   ────────────────────
     [1] These facts justify our objection to the Government and Probation Department's characterization of the conspiracy Mr.
     Baratov was involved in. *See* Addendum to the PSR re. Objection Number One.  The Government contends that Mr.
     Baratov was involved in a conspiracy to hack Yahoo!, Inc.; however, based on Mr. Baratov's lack of agreement to

25   participate in such a conspiracy, as well as Mr. Baratov's lack of knowledge regarding his co-conspirator's involvement in

However, the driving force behind Mr. Baratov's substantial sentencing guideline range is his involvement (entirely unrelated to the instant Indictment) in obtaining passwords to more than 11,000 email accounts. With respect to the actual harm to these individuals, the Government has identified only three victims that claim to have been injured by Mr. Baratov's conduct, all of which are located outside of the United States.

In fact, of the approximately 11,000 email accounts Mr. Baratov hacked, companies within the United States hosted only approximately 2,000 of those accounts.  The Government has not identified the victims of the 2,000 accounts and thus it is unclear whether the users of these email accounts are even citizens of the United States.  The remaining 9,000 accounts were hosted by various Russian email providers, including Yandex and Mail.ru.  Mr. Baratov's obtainment of approximately 9,000 passwords to email accounts hosted by various Russian email providers had no connection with or impact upon the United States or United States citizens.

## C.    GUIDELINES CALCULATION

### i.    Stipulated Guidelines

The parties stipulated to the following guideline calculation:

COUNT 1: Conspiracy to Commit Computer Fraud
| | |
|---|---|
| Base Offense Level (§2B1.1(a)(2)): | 6 |
| Presumed Loss Amount (at least $3.5 mil) (§2B1.1(b)(1)(J)): | +18 |
| More than 10 Victims (§2B1.1(b)(2)(A)(i)): | +2 |
| Sophisticated Means (§2B1.1(b)(10)(C)): | +2 |
| Conviction under 18 U.S.C. §1030 (§2B1.1(b)(17)(A)) | +2 |
| Adjusted Offense Level (Subtotal): | 30 |
| Acceptance of Responsibility (§3E1.1(a) & (b)): | -3 |
| **TOTAL OFFENSE LEVEL** | **27** |
| Criminal History Category I- Guidelines Range = | 70-87 months |

COUNTS 40-47: Aggravated Identity Theft
| | |
|---|---|
| Consecutive two years (18 U.S.C. §1028A(a)(1)): | +24 months |
| **TOTAL GUIDELINE RANGE:** | **94-111 months** |

the Yahoo!, Inc. hack, Mr. Baratov cannot be legally implicated in any conspiracy involving Yahoo!, Inc. *See e.g. United States v. Conkins*, 9 F.3d 1377, 1386 (9th Cir. 1993).  A more appropriate characterization of the conspiracy Mr. Baratov was involved in is limited to his agreement with another individual to attempt to hack into approximately 80 email accounts.

### ii.   Probation Department's Recommended Sentence

The Probation Department recommends a sentence of imprisonment at the bottom of the guidelines, 94 months. PSR Rec. at However, Probation Department's recommended sentence does not account for Mr. Baratov's willingness to plead guilty and transparency since his extradition to the United States.  The Probation Department's recommendation also failed to properly factor Mr. Baratov's youth, as well as the minimal impact Mr. Baratov's conduct had on individuals located within the United States.

### iii.   Government's Recommended Sentence

The Government recommends a sentence of imprisonment of 94 months (the low end of the Guidelines range, plus 2 years consecutive). The Government does not recommend that the Court impose restitution. Gov. Sentencing Submission (Dkt #36) at 14.

### iv.   Defendant's Requested Sentence

The Defendant respectfully requests the Court impose a sentence of 45 months (the low end of the Shadow Guidelines range, plus 2 years consecutive). The Defendant agrees with the Government, based on the lack of any proof of actual loss, that the Court should not impose restitution.

## D.   DEFENDANT'S RECOMMENDED SENTENCE UNDER THE 'SHADOW GUIDELINES'

In April 2013 the Criminal Justice Section of the American Bar Association assembled a Task Force to evaluate the reforms needed in the sentencing of federal economic crimes and to draft a proposed federal sentencing guideline to effectuate those reforms.  The Task Force published its report on November 10, 2014. This report, annexed hereto at Exhibit A, has become known as the 'shadow guidelines' ("Shadow Guidelines"). The authors note that like the current U.S.S.G., the Shadow Guidelines are designed to address *offense* characteristics, and that the Court should continue to separately consider *offender* characteristics in accordance with 18 U.S.C. § 3553(a).

The Task Force consists of a number of notable professors, practitioners, organizational representatives, observers from the Department of Justice and the Federal Defenders, as well as current and former judges, including the Honorable John Gleeson (formerly of the Eastern District of New York), the Honorable Judd Rakoff (of the Southern District of New York), the Honorable Gerard Lynch (of the 2nd Circuit Court of Appeals) and the Honorable Nancy Gertner (formerly of the District of Massachusetts and a current Professor of Law at Harvard Law School).

The Shadow Guidelines, annexed hereto at Exhibit A, are comprised of the following four (4) categories:

(a) Base Offense Level
(b) Specific Offense Characteristics
     (1) Loss
     (2) Culpability
     (3) Victim Impact
(c) Special Offense Considerations
(d) Offense Level Cap of 10 for non-serious offenses by first offenders

With respect to the instant matter, each category is addressed as follows:

**Base Level Offense**

The base offense level is that of the U.S.S.G., **6 Points**.

**Loss**

The Shadow Guidelines provide the following structure to account for loss amounts over $20,000:

| | |
|---|---|
| (A) More than $20,000 | add 4 |
| (B) More than $100,000 | add 6 |
| (C) More than $1,000,000 | add 8 |
| (D) More than $5,000,000 | add 10 |
| (E) More than $10,000,000 | add 12 |
| (F) More than $50,000,000 | add 14 |

The application notes regarding the Loss calculation under the Shadow Guidelines state simply: "To be incorporated from current 2B1.1 with the modification that loss means actual loss."

Here the agreed upon loss amount of $3.5 Million requires the addition of **8 points** under shadow guideline (b)(1)(C).[2]

**Culpability**

The Shadow Guidelines provide 5 levels of culpability:

 (A) Lowest     subtract 6-10
 (B) Low      subtract 3-5
 (C) Moderate    no change
 (D) High      add 3-5
 (E) Highest     add 6-10

These levels account for a wide range of factors that include, but are not limited to: (A) motive/nature of the offense; (B) the correlation between the amount of loss and the amount of gain; (C) the degree to which the offense and the defendant's contribution to it was sophisticated or organized; (D) the duration of the offense and the defendant's participation in it; (E) extenuating circumstances in connection with the offense; (F) whether the defendant initiated the offense or merely joined in criminal conduct initiated by others; and (G) whether the defendant took steps to mitigate the harm from the offense.

Although the authors of the Shadow Guidelines acknowledge that "these various factors will often overlap," the "end result of the court's analysis should be a culpability level that 'ranks' the defendant in the hierarchy of five levels of culpability for all defendants." Ex. A at 1. The application note goes on to state: "As a way of assisting the court in making the culpability assessment, it is anticipated that the middle culpability category – "moderate culpability" – would account for the largest number of defendants." Ex. A at 2.

---

[2] The addition of 8 points under the Shadow Guidelines, as opposed to 18 under the current guideline rubric, is consistent with the Application Note 20(C), which states that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." Application Note 20 (C) to U.S.S.G. §2B1.1. While defendant does not seek a downward departure, the Court may consider Application Note 20(C) when analyzing the § 3553(a) factors. *See United States v. Rosen*, 726 F.3d 1017, 1027 (7th Cir. 2013); *United States v. Burgos*, 2015 U.S. Dist. LEXIS 144141, *13, n.7 2015 WL 6447766 (N.D. Ind. Oct. 23, 2015).

**(A) Motive/Nature of the Offense**

In assessing the motive/nature of the offense, the Shadow Guidelines provide four (4) general categories that may be appropriate to describe an offender's conduct: (1) Predatory, (2) Legitimate *ab initio*, (3) Risk Shifting, and (4) Gatekeeping.   We submit that the most culpable of these levels, Predatory, is appropriate since the offense was "intended to inflict loss for the sole of dominant purpose of generating personal gain to the defendant...." Ex. A at 2.

**(B) Gain**

Three relevant considerations govern the culpability assessment as to the defendant's gain: (1) Commensurate with loss, (2) Less than loss, (3) Minimal or Zero.  Here, Mr. Baratov's gain was approximately $100 per victim, compared to the loss calculation of $500 per victim (U.S.S.G. § 2B1.1, cmt., application n. 3(F)(i)).  Thus, we submit that the middle category is appropriate.

**(C)  Degree of Sophistication/Organization**

The instant offense involved a fairly high level of sophistication.

**(D)  Duration**

The instant offense spanned over a longer period of time.

**(E)  Extenuating Circumstances**

The Extenuating circumstances in the instant matter are plentiful. This is Mr. Baratov's first arrest.  Additionally, Mr. Baratov was under the age of 22 during the majority of the time that he hacked email accounts.  No prior contact with law enforcement combined with Mr. Baratov's young age weigh heavily in favor of a low culpability calculation. *United States v. Gonzales*, 599 Fed. Appx. 742, 742 (9th Cir. 2015) ("The district court granted a five-level downward departure based on mitigating factors" including "his youth and lack of criminal history."); *See, cf.,. United States v. Allen*, 644 F.Supp.2d 422, 437 (SDNY 2009) ("One final possibility is a downward departure or a non-Guidelines sentence [...] In light of the circumstances of this case, the youth of the defendants at

1   the time of the relevant conduct, the disparity in sentencing caused by the inclusion of relevant (and

2   to some extent uncharged) conduct, and the role of the defendants in the criminal activity, this relief

3   may be appropriate.")

4         Additionally, the majority of the conduct underlying Mr. Baratov's loss amount calculation

5   had zero impact on companies and individuals located within the United States.  Of the 11,000 e-mail

6   accounts Mr. Baratov infiltrated, foreign companies hosted approximately 9,000 of those accounts

7   (more than 80%)—accounts that were not used by American citizens.

8   **(F)  Efforts to Mitigate Harm**

9         The instant record does not appear to include any significant efforts on Mr. Baratov's part to

10  mitigate harm within the meaning of the Shadow Guidelines.

11  **Summary of Culpability**

12        The instant offense involves conduct that is predatory, sophisticated, and spanned over a long

13  period of time.  However, the Court must equally consider the extenuating circumstances present and

14  the medium to low level of gain Mr. Baratov achieved from each victim.[3]  Although Mr. Baratov

15  does not likely fall into the "Lowest" category of culpability, Mr. Baratov does not distinguish

16  himself, as a first time offender, from the bulk of offenders that fall under the "Low" or "Moderate

17  Culpability Guideline."  Thus, pursuant to shadow guideline (b)(2), the Court should add **0 Points** to

18  Mr. Baratov's sentencing calculation.

19  **<u>Victim Impact</u>**

20        The Shadow Guidelines provide four levels of victim impact:

21        (A) Minimal or none          no increase
          (B) Low                      add 2
22        (C) Moderate                 add 4
          (D) High                     add 6

23

24  [3] Although Mr. Baratov's gain amounted to a significant sum, this was based more on the volume of victims, which is
    specifically addressed in the Victim Impact section of the shadow guidelines. Ex. A at 2. ("In assigning a culpability level,
    the court should be careful not to "double count" the amount of loss or the victim impact, each of which is a separate
25  specific offense characteristic.")

DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF SENTENCING                              10

The application notes describe four (4) factors to consider when determining the significance of impact of the defendant's actions on his victims.  The categories include (A) Vulnerability of the Victims, (B) Significance of Loss, (C) Other non-economic harm, (D) Victim Inducement of Offense.

**(A) Vulnerability of Victims**

Here, Mr. Baratov's victims were not targeted because of their vulnerability.  Mr. Baratov had no information about his victims prior to being contacted by his customers, and did not consider a particular victim's degree of vulnerability when choosing to hack his or her email account.

**(B)  Significance of Loss**

The Shadow Guidelines consider losses that threaten a victim's financial soundness to be more egregious than otherwise. Ex. A at 6. With a few exceptions the Government has identified, the overwhelming majority of Mr. Baratov's victims were jealous husbands or wives or boyfriends or girlfriends that were snooping on their significant others.  Despite the large number of victims, as evidenced by the lack of responses from the Government's inquiries, there is little evidence to indicate that Mr. Baratov's actions resulted in serious financial loss to any of his victims.

**(C)  Other Non-Economic Harm**

Here the victims of Mr. Baratov's crimes clearly suffered non-economic harm in the form of an invasion on their privacy.  However, the Shadow Guidelines limit this category specifically to instances where the non-economic harm is "not captured in the loss adjustment, and thus the guideline may understate the seriousness of the offense […]" Ex. A at 6. Here, the loss amount sufficiently and accurately accounts for the non-economic harm that Mr. Baratov caused because the loss calculation is comprised exclusively of the number of Mr. Baratov's victims multiplied by $500, which is the presumed loss amount under U.S.S.G. § 2B1.1, cmt., application n. 3(F)(i) that is meant to account for immeasurable and non-economic harm. Thus, any additional points for culpability

attributed to this subsection would constitute double counting, which his impermissible under this section of the Shadow Guidelines.

**(D)  Victim Inducement of the Offense**

In some circumstances it may be appropriate to partially discount the Victim Impact calculation due to the victim's conduct in contributing to the offense.  This is not one of those circumstances.

**Summary of Victim Impact**

There is no reason to add any significant amount of points to Mr. Baratov's calculation based on Victim Impact.  Mr. Baratov did not select his victims based on their vulnerability and almost no victims have reported any financial harm as result of Mr. Baratov's conduct.  To the extent that Mr. Baratov's victims were large in number and effected by non-economic harms, the loss amount of $3.5 Million sufficiently accounts for these considerations, which are the driving force behind Mr. Baratov's significant guideline range. To add points to Mr. Baratov's calculation under this section would be contrary to the application notes herein and would constitute double counting.  Thus, pursuant to Shadow Guideline (b)(3), the Court should add **2 Points** to Mr. Baratov's sentencing calculation.

**(C)  Special Offense Considerations**

The Shadow Guidelines adopt as special offense considerations the factors listed in U.S.S.G. § 2B1.1(B)(3) through (9), (11) through (14), or (16) through (18).  For each of these offense considerations an increase of 2 points should be applied where the concern has not already been addressed in determining the offense level.

In the instant matter, as agreed upon by the parties, the following considerations would apply:

| | |
|---|---|
| More than 10 Victims (§2B1.1(b)(2)(A)(i)) | +2 Points |
| Sophisticated Means  (§2B1.1(b)(10)(C)) | +2 Points |
| Offense Under 18 U.S.C. § 1030 (§2B1.1(b)(17)) | +2 Points |

Thus, the Court should add **6 Points** pursuant to section (c) of the Shadow Guidelines.

**(d)  Offense Level Cap of 10 For Non-Serious Offenses By First Offenders**

Although this is Mr. Baratov's first offense, we do not submit that this would fall under the category of a not "otherwise serious" offense as defined under 28 U.S.C. § 994(j).  Thus the 10-point cap does not apply.

### Final Calculation Under the Shadow Guidelines

Considering the appropriate impact sections 3E1.1(a) & (b), the Shadow Guideline range should be calculated as follows:

COUNT 1: Conspiracy to Commit Computer Fraud

| | | | |
|---|---|---|---|
| (a) | **Base Level** | | 6 |
| (b) | **Special Offense Characteristics** | | |
| (b)(1) | Loss | | 8 |
| (b)(2) | Culpability – Moderate | | -3 |
| | (A)  Motive/Nature of the Offense | | |
| | (B)  Gain | | |
| | (C)  Sophistication | | |
| | (D)  Duration | | |
| | (E)  Extenuating Circumstances | | |
| | (F)  Efforts to Mitigate | | |
| (b)(3) | Victim Impact | | 2 |
| | (A)  Vulnerability of Victims | | |
| | (B)  Significance of Loss | | |
| | (C)  Non-economic Impact | | |
| | (Only if not accounted for in loss amount) | | |
| | (D)  Victim inducement | | |
| (c) | **Special Offense Considerations (2B1.1(b) Factors)** | | |
| | (2)(A)(i) | 10+ Victims | 2 |
| | (10)(c) | Sophisticated Means | 2 |
| | (17)(A) | 1030 Offense | 2 |
| | | | 19 |
| | 3E1.1(a) &(b)  Acceptance | | -3 |
| | | | **16** |
| | Criminal History Category I- Guidelines Range = | | 21-27 Months |

COUNTS 40-47: Aggravated Identity Theft

Consecutive two years (18 U.S.C. §1028A(a)(1)):   <u>+24 months</u>

**TOTAL GUIDELINE RANGE:   45-51 months**

1    We submit that the calculation rendered by the application of the Shadow Guidelines may

2    properly be considered by this Court and weigh in favor of a lenient sentence for Mr. Baratov. *See*

3    *United States v. Faibish*, No. 12-cr-265, 2015 US Dist LEXIS 101200, at *6 (EDNY July 16, 2015)

4    (ENV)) (Judge Eric N. Vitaliano rejected the Sentencing Commission's guidelines' recommended

5    80-year sentence and instead imposed a 63-month sentence by relying on the Shadow Guidelines

6    under Section 3553(a) and stating, "[t]he Court also takes notice that the American Bar Association

7    Task Force on the Reform of Federal Sentencing for Economic Crimes offers an alternative model to

8    consider in sentencings for crimes of the stripe committed by Faibish. *See A Report on Behalf of the*

9    *American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing*

10   *for Economic Crimes*, (Nov. 10, 2014), *available at* http://www.americanbar.org/content/dam/aba/")

11   In *Faibish*, Judge Vitaliano concluded that the "while the current guidelines system does not

12   provide a reasonable way to…try to provide fair and just punishment…the ABA task force guidelines

13   certainly significantly move in that direction." Robert J. Anello and Richard F. Albert, *Rise of ABA*

14   *Task Force's 'Shadow Sentencing Guidelines*,' New York Law Journal, Volume 255-No.64, April 5,

15   2016, at 2. (*citing* Sentencing Transcript, *United States v. Faibish*, 12cr265 (E.D.N.Y. March 10,

16   2016) at 23:20-25, 54:2-3, 10-11) The Court stated that analysis under the Shadow Guidelines was

17   "fairly reflective of what a court is required to do under Section 3553(a)" and that to follow the

18   Shadow Guidelines "is what is most reasonable here." *Id.*

19   Similarly, in *United States v. Rivernider,* Judge Chatigny stated the shadow guideline

20   calculation of 144 months, was "preferable to" the 324-405 month calculation under the sentencing

21   guidelines because the sentencing guidelines "significantly overstate[d]" the defendant's culpability.

22   *Id.* (citing Sentencing Transcript, *United States v. Rivernider*, 3:10cr222 (D. Conn. Dec. 18, 2013) at

23   206:10-13, 212:5-14); *see also United States v. Rivernider*, 828 F3d 91, 114 (2d Cir 2016).

24

25

Finally, in *United States v. Litvak*, in determining the appropriate sentence to impose, District of Connecticut Chief Judge Janet C. Hall stated that she studied the Shadow Guidelines and was in "complete agreement with the drafters of this proposal, some of whom are very highly regarded judges in this circuit, in which the drafters urge the courts not to focus on things that are easily quantifiable." *Id.* (*citing* Sentencing Transcript, *United States v. Litvak*, 3:13cr19 (D. Conn. July 23, 2014) at 135-136.) Thus, despite a guideline recommendation in the pre-sentence report of 108-135 months, Judge Hall sentenced the defendant to 24 months in prison. *Id.*

For the reasons articulated above, as well as the reasons described below in sections E and F, the Defendant respectfully requests the Court impose a sentence of 45 months (the low end of the Shadow Guidelines range, plus 2 years consecutive), 3 years supervised release, and no restitution.

## E.   THE NEED TO AVOID DISPARITY IN TREATMENT OF SIMILARLY SITUATED DEFENDANTS

The Court must also consider the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. §3553(a)(6) The importance of avoiding sentencing disparities has been an ongoing concern in both state and federal courts. In fact, the principal goal sought to be achieved through the passage of the United States Sentencing Guidelines was the elimination of disparate sentences. As the court stated in *United States v. Rattoballi*, 452 F.3d 127, 133-34 (2d Cir. 2006), "[d]isparate sentences prompted the passage of the Sentencing Reform Act and remain its principal concern." *Id.* (*citing Booker*, 543 U.S. at 263-64; 18 U.S.C. § 3553(a)(6); 28 U.S.C. § 991(b)(1)(B); *see also* S.Rep. No. 98-225, at 52 (1983) ("A primary goal of sentencing reform is the elimination of unwarranted sentencing disparity.")

The need to avoid disparate treatment can best be achieved by granting Mr. Baratov a below guidelines sentence.  Other defendants similarly situated to Mr. Baratov received much more lenient sentences in cases involving similar or more culpable conduct. For example, in *U.S. v. Ryan Collins*, No. 16 cr 121 (J. Caldwell) (MDPA) the defendant Collins committed similar phishing activity as Mr.

1   Baratov; however, aggravating circumstances existed by virtue of the fact that Collins' hacking

2   activity was for the purpose of sexual gratification and caused measurable harm:

3   > Defendant engaged in a sophisticated phishing scheme in which he
    > tricked his victims into providing password information to iCloud and Gmail
4   > accounts so that he could access their personal data, including nude photographs.
    > Based on log information, the Government identified over 600 victims of
5   > defendant's conduct. Many of defendant's victims included celebrities, and 50-
    > 100 victims had at least one nude photograph stolen.
6   > Defendant admitted to undertaking his hacking activity "for sexual
    > gratification" and did not believe that what he was doing was "really that bad."
7   > Defendant's attempts to seek that sexual gratification at the expense of other
    > women were furthermore not limited to his unauthorized access of their iCloud
8   > and Gmail accounts; defendant also ran a modeling scam in which he tricked
    > victims into sending him nude photographs of themselves in the guise of
9   > accepting applications for modeling jobs.

10  Ex. B at 1-2. (internal citations omitted)

11  Collins was ultimately offered, and accepted, a plea to one count of Unauthorized Access to a

12  Protected Computer to Obtain Information, which contained the following guideline calculation:

13  Base offense level 6 (§2B1.1(a)(2))                        +6
    More than 10 victims (§2B1.1(b)(2)(A)(i))                  +2
14  Sophisticated means (§2B1. 1(b)(10)(c))                    +2
    Personal information (§2B1.1(b)(2)(B)(17)(A))              +2
15                                                             12

16  Level 12 with no criminal history rendered a sentencing range of 10-16 months. Ex. B at 2-3.

17  Defendant Collins was sentenced to **18 months in prison**. Ex. C at 3.

18  In a similar case, *U.S. v. Edward Majerczyk*, No. 16 cr 550 (CPK) (NDIL Eastern Division)

19  defendant Majerczyk committed conduct similar to Mr. Baratov:

20  > Defendant engaged in a sophisticated phishing scheme in which he
    > tricked his victims into providing usernames and password information for their
21  > email accounts to a third-party website, which website defendant then accessed
    > to obtain the victims' usernames and passwords. Defendant then accessed the
22  > victims' email accounts to access their personal data, including nude
    > photographs and videos.  In at least 30 instances, defendant obtained full Apple
23  > iCloud backups for victims. Based on log information, the Government identified
    > over 300 victims of defendant's conduct. Defendant has admitted his conduct,
24  > and admitted to doing so to "see things through other people's eyes" and "for
    > kicks."

25

Ex. D at 1. (internal citations omitted)

Majerczyk was ultimately offered, and accepted, a plea to one count of Unauthorized Access to a Protected Computer to Obtain Information, which contained the following guideline calculation:

| | |
|---|---|
| Base offense level 6 (§2B1.1(a)(2)) | +6 |
| More than 10 victims (§2Bl.l(b)(2)(A)(i)) | +2 |
| Sophisticated means (§2Bl.l(b)(10)(c)) | +2 |
| Personal information (§2Bl.l(b)(2)(B)(17)(A)) | +2 |
| <u>Acceptance of Responsibility</u> | <u>-2</u> |
| | 10 |

Level 10 with no criminal history rendered a sentencing range of **6-12 months**. Ex. D at 2. Defendant Majerczyk was sentenced to **9 months in prison**. Ex. E at 4.

In yet another analogous case, *U.S. v. Hatala*, 552 Fed. Appx. 28 (2014), the defendant's guideline range was 18-24 months and he was ultimately sentenced to 30 months in prison. Ex. G at 5. The defendant's conduct in that case was very similar to Mr. Baratov's conduct, but also contained the aggravating fact that Hatala stole login information for PayPal accounts to consummate fraudulent online purchases:

> As described more fully in the PSR, the defendant was arrested as part of an undercover sting operation aimed at those involved in "carding" crimes – various criminal activities associated with stealing personal identification information and financial information belonging to other individuals (*e.g.*, account information associated with credit cards, bank cards, debit cards, or other access devices) and using that information to obtain money, goods, or services without the victims' authorization or consent. Those involved in carding crimes – "carders" – often use online forums on the Internet to facilitate their criminal activity, by exchanging information related to carding, such as hacking methods or computer-security vulnerabilities that can be used to obtain personal identification information, and also by exchanging goods and services related to carding, such as stolen credit card account numbers or other personal identification information that can be used to consummate fraudulent online purchases.
>
> The sting operation that resulted in the defendant's arrest involved the use of an undercover carding forum controlled by the FBI (the "UC Site"). The defendant was a member of the UC Site whose primary activity on the site consisted of disseminating login information for online accounts at Paypal and other websites. The defendant sold or otherwise distributed such information to other site members, knowing that they intended to use the information to effect fraudulent online purchases or to facilitate other fraudulent activity.

The defendant obtained user login information by hacking into customer databases associated with vulnerable websites and stealing the usernames and passwords of the customers of those websites. The stolen usernames were typically in the form of e-mail addresses. The websites that the defendant stole these usernames and passwords from were not necessarily commercial in nature or otherwise of particular use to carders. However, because Internet users often use the same usernames and passwords to access their various online accounts at different sites, the usernames and passwords stolen by the defendant were of potential use to carders to the extent that they could also be used to access other accounts of the users at issue. In particular, to the extent the username/password combinations could be used to access financial accounts, such as accounts at online payment processors such as Paypal, or online stores such as Amazon, or online bank accounts, and so on, the username/password combinations could be used to access these accounts and obtain access to credit or other means of payment that could be used to conduct fraudulent purchases online.

Understanding this, the defendant ran the username/password combinations he stole through a "Paypal checker" – a piece of software designed to test each username/password combination to see whether it could be used to access a live account at Paypal. The defendant similarly checked the username/password combinations he stole to see if they could be used to access accounts at online commerce sites, such as accounts at Amazon.com, Ebay.com, and Walmart.com. For username/password combinations that were linked to e-commerce accounts, the defendant advertised these username/password combinations on the UC Site as such and sold them to other site members seeking to use these accounts to make fraudulent online purchases.

Additionally, the defendant also sold or distributed username/password combinations in the form of raw "dumps," *i.e.*, bulk lists, each composed of thousands of username/password combinations that had not necessarily been pre-tested or pre-sorted according to whether they could be used to access e-commerce sites. As noted in the PSR, one of these "dumps" was recovered during the investigation and found to contain over *150,000* unique e-mail username/password combinations. The criminals to whom the defendant distributed these dumps could, in turn, use these username/password combinations for various criminal purposes. For example, they could run the usernames and passwords through "checker" software of their own, to determine whether any of them could be used to access various types of electronic accounts. Or they could use the thousands of e-mail addresses contained in the dumps to send out "phishing" emails to the e-mail users at issue, *i.e.*, e-mails designed to trick the users to reply with further identifying information that could in turn be used to commit identity theft and to execute fraudulent online transactions.

Although the defendant advertised his stolen username/password combinations on the UC Site, when he was contacted by other users interested in acquiring his wares, he typically invited the users to communicate further off the UC Site, through Internet chat services, such as MSN Instant Messenger. Because the FBI was unable to monitor these chats through the operation of the UC Site, the extent of the defendant's actual sales of username/password combinations is not fully known. However, following his arrest, the FBI obtained

and executed a search warrant for a computer used by the defendant at his father's residence. Through forensic analysis of the computer, the FBI was able to recover logs of online chats between the defendant and various third parties (*not* law enforcement personnel) in which the defendant consummated sales of approximately 300 usernames/passwords which he claimed to be verified Paypal accounts. The specific Paypal accounts being sold were not always identified in the chats themselves. However, some of the accounts were specified in the chats. The FBI has provided a sample of these accounts to Paypal, which has confirmed that the accounts are valid Paypal accounts. The FBI is awaiting information from Paypal as to the remainder of the accounts as well as any information as to whether any of the accounts at issue have experienced fraudulent activity.

Ex. F at 2-4. (internal citations omitted)

The defendant was ultimately offered, and accepted a plea containing the following guideline calculation:

| | |
|---|---|
| Base offense level 6 (§2B1.1(a)(2)) | +6 |
| At least $150,000 loss (§ 2B1.1, Application Note 3(F)(i)) | +10 |
| Unauthorized access devices. (§ 2B1.1(b)(11)(B)) | +2 |
| Acceptance of Responsibility | -3 |
| | 15 |

Level 15 with no criminal history rendered a sentencing range of **18-24 months**. Ex. F at 6. Hatala was ultimately sentenced to **30 months in prison**. Ex. G at 5.

Here, Mr. Baratov's conduct is substantially similar to all the above defendants yet Mr. Baratov's guidelines are astronomical in comparison. The Government will attempt to distinguish Mr. Baratov's case from the aforementioned cases using the loss amount. However, this is unpersuasive because Mr. Baratov's 11,000 username/password combinations pales in comparison to Mr. Hatala's database of *150,000* unique e-mail username/password combinations, which were used to facilitate fraudulent online purchases causing significant financial harm to the victims.

All of the above referenced defendants have the same criminal history (none) as Mr. Baratov and all engaged in very similar (or more egregious) criminal conduct. Accordingly, to avoid disparity among similarly situated defendants, we respectfully submit that a below guideline sentence is more appropriate for Mr. Baratov.

## F.   **MR. BARATOV'S HISTORY AND CHARACTERISTICS**

Mr. Baratov is a 23-year-old citizen of Canada.  He was born in Kazakhstan, but moved to Canada when he was 12 years old.  Although he was very intelligent at a young age, Mr. Baratov found it difficult to integrate into his new community due to his inability to speak English well.  He did, however, find comfort in learning about computers, and sought to advance his computer skills from a very young age.  By 12 years old, Mr. Baratov was able to code in several different "languages" and perform complicated and advanced programming tasks.

As time passed, Mr. Baratov became more acquainted with techniques often referred to as "hacking."  Despite his great ability, Mr. Baratov refrained from repeated participation in most hacking activities, confining his services to obtaining passwords to email accounts.  Motivated by curiosity and interest, Mr. Baratov provided his services free of charge until the age of 14 when one satisfied customer voluntarily paid him.  From that point forward, Mr. Baratov began charging for his services.

As time passed, Mr. Baratov's passion for performing services was overtaken by his desire for wealth.  At the young age of 16, Mr. Baratov realized the potential fortune he could obtain by providing his email hacking services on a larger scale. He began advertising his services across Russian Internet servers, and his business began to grow.

Mr. Baratov always took steps to filter his clients and targets, working only those he believed to be Russian, and intentionally refusing requests to hack email accounts he believed to be connected with Governments, banks, and U.S. and Canadian citizens.  Although Mr. Baratov's system was not perfect, the overwhelming amount of Mr. Baratov's requests came from Russian husbands, wives, boyfriends, and girlfriends that wanted information about their significant others.

What began as a prank by a child turned into a business by an adolescent teenager, and, prior to the instant Indictment, an easy means to earn money as a young man. However, throughout all of

this, Mr. Baratov's character and personality developed. Mr. Baratov's friends and family wrote letters to Your Honor to assist the Court in appreciating the compassionate, thoughtful, and caring young man Mr. Baratov is. The letters attached hereto uniformly describe Mr. Baratov as a warm, inviting, helpful young man who has the unique ability to inspire others. We submit that Mr. Baratov's good character weighs in favor of a lenient, below guideline sentence.

Mr. Baratov's family wrote a joint letter describing the type of son and brother he is and how much they love him. They wrote:

When his sister finished the Art and Animation course at Mohawk College, she couldn't find any animation job because she had only 2 years of studying, and the companies only hire those who studied at least for 4 years and has experience. She felt desperate, depressed and lost. She didn't know what to do and was ready to give up and just work at some place like Starbucks for the rest of her life. Karim was very kind, supportive, and encouraging. He told his sister not to give up and that she should keep studying. Thanks to Karim, this year, Sabina will graduate Redeemer University College with the bachelor's degree in Philosophy and English. Thanks to her brother, Sabina has found her true calling. Moreover, Karim encouraged Sabina about her writing skills; he inspired her to believe in herself, that she could write good articles. It is thanks to Karim that Sabina was able to publish her papers on philosophy. Without Karim's encouragement, kindness and support Sabina wouldn't have achieved so many good things. Karim still supports her in everything she does, and thanks to him, she will pursue a career in teaching and will keep writing philosophy chapters.

Karim has always been a family man. When he was little, he learned to cook, so that he could cook for his family. For example, he usually made breakfast for everyone and for our birthdays he baked cakes. When Karim started earning money, he had a desire to open a family business in order to make his parents' lives easier. The nursing job is very hard. It drains the energy out of the person. Karim didn't want his mother to feel so exhausted after her work day. He didn't want his father to go to the tiring business trips to Kazakhstan. Karim was hoping that a family fast-food restaurant business would make his parents' lives easier and happier.

Karim also loves and cares about children. On December 21, 2016, Karim was part of the Toys R Us North Face Rally to help hospitalized children who suffer serious illnesses. He knew that there were ill children who would be spending Christmas in hospital, so he and a few others raised over $15,000 to purchase toys for the children. A few days later, he and other kind people drove to the Kids Hospital in Toronto to deliver the toys. He changed their Christmas that year. Many children were happy on Christmas day thanks to their generosity.

> Karim always tries his best to be optimistic and strong. He doesn't want to see anyone suffer, so he arms himself with a brave smiling face. Even though he acts strong, Karim is still very young, and we know he has suffered tremendously. People make mistakes even during their adult years, and he has learned from his mistakes. He will not commit any more crimes. Karim is very smart and he doesn't want to inflict any more pain on his family and friends, nor on anyone else for that matter. We love him immensely and wait for his return.

Ex. H, bates 2-4.

Mr. Baratov's girlfriend of two and a half years, Deborah Liendo, describes Mr. Baratov as kind, sweet, and supportive. She describes how understanding and empathetic Mr. Baratov is and how committed both of them are to their relationship:

> In 2016, just a month after we began dating, I started going to chef school in Ottawa. From Ancaster to Ottawa it is about 5-6 hour drive. When I realized that it would be selfish to ask him to stay in a long-distance relationship, I told him I understood if he didn't want to continue dating at the time. Rather than give up on our relationship, Karim vowed to keep the relationship alive and continue to visit me in Ottawa every two weeks for the nine months I stayed in school. Not only did he show how committed he was to our relationship, but he showed the character of a mature man willing to do what is necessary to keep the relationship in good spirits and make me feel protected and supported.
> [...]
> The fact that he is not here with me is a new challenge for us both. We love each other and support each other. This is why through these nine months that he has been apart from his family and friends, we have been sending each other letters every week. Through the letters we not only find comfort but we also find hope for our future. I have decided to stay by his side and wait for his return. I have faith in a future with him, a future where we will be together and we will move forward hand in hand.

Ex. H, bates 5-7.

Deborah's sister Abigail Meza, who has known Mr. Baratov for several years and is currently working as an illustrator for a children's diabetes book, details instances that reflect Mr. Baratov's compassionate character. Abigail writes:

> [...] Karim and I developed a close friendship. He would come to see me every day, sometimes twice a day, just to keep me company. On days where the cafe was empty, him and I would sit down and talk for hours. It was astonishing to have met someone who wouldn't hesitate to listen to personal matters, and not ask for anything in return. He was just good-hearted.

One day during the summer I had a date that I was especially looking forward to. The date did not go as well as hoped and I was extremely upset. However, I tried not to show my despair. Karim came to visit me that day at the cafe. He knew right away the date had not gone well, I could tell from the expression on his face and the tone of his voice. Regardless, he asked me politely to sit down and talk to him. He listened to everything I had to say, and how utterly upset I was. After I was done telling my story, I quickly saw him take on the role of an older brother. He told me, 'You deserve someone who is proud of you, and keep his promises.' I could tell he was genuinely concerned at my distress, and he meant every word. From that moment forward, I associated him as just that, an older brother, who I didn't have to shy away from or sugar-coat any stories. He was always honest with me, and it was only fair that I show him the same kind of honesty and respect.

As the summer went on, our friendship grew stronger. My brother's wedding was soon approaching, and Karim and I wanted to look our absolute best. Him and I had been planning on hairstyles, shoes, etc. The day came that I had to get my haircut, and unfortunately, I did not have a way to get to the salon. I was quite reluctant to ask him to drive me, but I mentioned it and without thinking twice about it, he said yes. After driving me there, he waited for me. At the time I was learning how to drive, and he was persistent that I experience driving lessons from him, so I agreed to drive us home. Luckily, I managed to get us both home safe and he gave me little tips along the way. That memory is one I'll treasure forever. He's an amazing, selfless, individual and I consider myself lucky to be included in his circle of friends.

His generous and noble character shines through him. He is an amazing individual who cares deeply about those around him. There have been many other instances, not just with me, where he has shown his selfless and kind nature. These are only a few examples of the type of person Karim truly is.

Ex. H, bates 8-9.

Razvan Adrian Zahari, Mr. Baratov's friend since they met in sixth grade, describes Mr. Baratov as a "kind hearted young man" who "possesses compassionate qualities towards others and values his family and friends tremendously." Ex. H, bates 10. He goes on to describe their friendship:

When I met Karim in the sixth grade, we instantly developed a friendship as we were both the "new kids" and had several things in common. I am pleased to say that I know Karim very well. I know he is a very kind and caring person. He has personally helped me get through many of my personal struggles. He was the only friend I had who stuck around when things got tough. He was an excellent support system and motivator for myself and many other people. He would always be the first person to offer help if he saw anyone struggling.

After graduating high school, I was lost. I wasn't certain what I was going to do with the rest of my life. However, Karim was there for me the whole

time offering his upmost support. He was very supportive in my hard times and even gave me great advice/ideas of what I could do. Most importantly, Karim taught me how to always keep positive and dream big. He is a very positive individual who is able to see the light side even in the darkest situations.

*Id.*

Alex Nguyen, Mr. Baratov's friend for several years, describes the incredible kind of friendship that Mr. Baratov offers:

[Karim] inspired me to work hard and stay focused. Karim was a great influence, he was not the average individual for his age. Over the years, Karim was very supportive in different business ventures, he'd often use his network of friends to connect and help each other, which was super beneficial. Indirectly, his influence has lead me to accomplish many things in such a short period of time. From starting my own company, allowing my parents to retire, to buying my first real estate property. I am very grateful for Karim's presence in my life.

Karim cares about his friends more than he does himself. There have been countless times where Karim was there for his friends and showed us we were his top priority. I remember many occasions when I was stressed for exams and assignments and Karim was always willing to stop whatever he was working on and hang out with me. He was there to help me clear my mind and take a break from the pressures of the world. He was there to organize lunch and dinner gatherings with all our friends. He was there to make sure we were doing well, and to He is such a warm inviting person and would make sure everyone felt included. He went out of his way to arrange for us to do fun activities together and would do his best to make sure we all enjoyed our experiences with each other.

Karim always wanted his friends to succeed. Over the years, Karim amassed a large social media following and used it to help others. On several occasions Karim would leverage his social media following to promote his friend's small businesses to help them grow. The small businesses ranged from vinyl wraps to clothing accessories, and Karim would not take monetary payment to promote these companies. Karim just wanted to see people succeed. Karim has been and will always be very generous and his character shows when he interacts with others. He never wasted time arguing about small things.

Ex. H, bates 11-12.

Sonia and Paul Ruprai, siblings who have known Mr. Baratov since Paul met him at a car meet several years ago, have become family to Mr. Baratov.  Paul met Mr. Baratov in 2015 at a car

meet. Mr. Baratov and Paul shared family values and a common love for cars. Ex. H, bates 15-16.

Paul describes their relationship and Mr. Baratov's character:

> My life has changed quite a bit after meeting Karim. One of Karim's best qualities became an asset to my company. Karim's natural ability to bring people together was a blessing. He was never hesitant to introduce people to one another or lend a helping hand to anyone that needed it. He would refer business to detailers, car mechanics, hair dressers, insurance brokers, etc. He was always trying to help young entrepreneurs get exposure for their businesses so that others could benefit from their own talents.
>
> Making mistakes is human. When you make a mistake, there are only three things to do: admit it, learn from it, and don't repeat it. I truly believe that Karim is a person that can learn from his mistakes. I know he has the talent and work ethic to make a positive change in his life.
>
> My life, on the other hand, has changed a lot since he has been gone. I haven't been at ease knowing a family member has been away for a year. My niece and daughter ask when "Uncle Karim" is going to be back. It also pains me to see the impact this has made on his family. His parents, who remind me of my own, are extremely loving and hardworking people. I could not imagine how they go about their day-to-day lives missing their child and his sister missing her little brother.
>
> [...]   I can see he's learned a lot from this experience and is saddened by the impact it has left on his friends and family. He has great remorse and I know he will never engage in this type of conduct again. He is young, smart, and has a wonderful outlook on life. He has suffered and I know he has learned his lesson.
>
> Thank you in advance for your consideration, and for taking the time to read my letter. I hope that it will help shed some light on the good person that Karim is. Second chances are not given to make things right, but are given to prove that we could be better even after we fall. I hope to see my friend and brother soon.

*Id.*

Paul's sister Sonia, a 30-year-old mother of two who currently has a career in Education

within the District School Board, describes how she first met Mr. Baratov:

> Growing up in our household, we rarely ever brought friends home unless my parents knew them and their families well enough. When my brother met Karim, they instantly grew fond of each other and had many similar interest and hobbies. When my brother said he wanted to invite him over for dinner it was a big deal as my brother is very careful with who he brings home to his family and niece. I knew that his friendship with Karim was a special and meaningful one. The very first time I met Karim was over dinner at my parent's house. Karim had

brought over some dessert and greeted each of us politely and with respect. When Karim saw my 5-year-old daughter, he got down to her level, introduced himself, and gave her a high five. My daughter was so happy that she was noticed by this guest and as an educator I instantly could see how he was caring enough to come down to her level as an equal when he introduced himself. During dinner, as everyone was conversing, I couldn't help but notice how he made everyone, including my daughter, feel like a part of the conversation. That was the first of many wonderful occasions we had with Karim. After that evening, we saw him quite often at our house, having dinner and being a part of our family and always had a peaceful, positive aura about him.

My daughter really adored Karim and he would always greet her first when he came over, making sure she felt like she was included and not ignored by the adults. He soon became "Uncle Karim". I'm so sad and heartbroken about Karim's absence I have to tell her that her Uncle Karim is on "vacation" and we aren't sure when he will be back home again to visit.

Each visit, every conversation, was always wonderful with Karim. He listened, cared and was very thoughtful in his responses and opinions. Karim would always have a positive outlook on every situation. He was a great influence on my brother. He would come over for holidays and celebrate with us. When my brother and sister-in-law had a baby, he was the first one to come over and see the newest addition. It makes me so sad that he is not with us as now I just recently had a baby and I would have loved for her to meet her Uncle Karim too.

Since Karim has been gone it has impacted our lives and has shaken each and every one of us. As a parent it saddens me inside that Karim is far away from his parents and his sister, and our family. Calling Karim breaks my heart as he is so far away from the ones who love him. I can see the toll this has taken on him and I can't imagine how he must be feeling right now, though I know he trusts that Your Honor will make a fair decision in sentencing him. "Remember that life's greatest lessons are usually learned at the worst times and from the worst mistakes". Karim certainly learned his lesson. For a 23-year-old who has such a beautiful and warm heart, the time he has already spent in jail has certainly caused him to realize he has made the worst mistake of his life. He would never do something like this again.

Ex. H, bates 13-14.

Mateeollah Faiz, one of Mr. Baratov's friends he worked-out with, describes Mr. Baratov as caring and loving. He writes:

The Karim that I know is a joyous, caring, loving and giving young man that has an endless passion for cars and fitness. Many young kids looked up to Karim and would often send him messages that some of us might have found annoying, but Karim would always take the time to respond and help out regardless of the person, whether they were fourteen or a thirty. Karim and I

1  would religiously go to the gym on a daily basis and while at the gym many
2  people would approach him to talk about cars or fitness, but he would never
   brush off or rush anyone. If he missed a day at the gym, friends would come to
3  me and ask why he was not there. He was loved by so many people throughout
   the city. We had a daily routine, after our workouts we would go for a protein
4  shake and then off to dinner for our post-workout meal. He would always talk
   about my schooling and how I should finish off my University degree in Law
5  and Society and pursue the path of law school because I would live a
   comfortable life in the future. He looked out for me like a genuine friend should
6  and I truly owe a great deal to Karim for everything that has happened in my life
   up until this day.

7         Karim always had his friends around positivity and never in situations
8  where anyone felt uncomfortable or threatened. I wish I could say I am the only
   one who misses and loves him but I would be wrong. There is a whole
9  community of people who love and miss Karim just as much as I do. Every car
   meet that we attend we are approached by people asking about him and sending
10 their regards. We would always imagine what Karim would do or say if he were
   with us at that moment because he was always the life of the crowd. He always
11 had a big smile on his face regardless of any situation and I do not believe
   anyone has ever seen him being negative or upset.

12         Karim knows and takes responsibility for his mistakes/actions so please
13 take into consideration his pleading guilty so as not to punish him more than is
   necessary. He is a loving friend, brother, and son who would care for and visit
14 his family on a daily basis. Although Karim is a year younger than me, I still
   looked up to him for his maturity and loyalty as a friend.

15 Ex. H, bates 17-18.

16     Dave Smith, a friend of Mr. Baratov's for the past 9 years since the beginning of high school,

17 describes him as kind, sincere, and honest. He writes:

18         We practically lived with each other every day of high school in the sense
19 that we would hang out together every day, we were in some of the same classes,
   we would eat lunch together, we would work out at the gym together at school,
20 go to the movies together, and often would eat out at subway together. Karim
   and I often worked on school projects together. Whenever I didn't have a partner
21 on school projects Karim was always more than willing to be my partner. We
   frequently hung out at Karim's house playing cards. Karim has never done
22 anything to break our friendship. We never got angry at each other and have
   never had a falling out over the past 9 year we've known each other. He is one of
   the greatest people I know. He has a good heart.

23
24         One of Karim's greatest qualities is that he is always there for his friends.
   One of my most meaningful memories with Karim is when I went through a bad
25 break up. Karim would meet up with me at a coffee shop, or wherever, to help
   me get through it. He would drop whatever he was doing to meet up with me and

cheer me up. The world needs more people that are like Karim. Karim and I have similar beliefs in being kind to everyone and being a good person to everyone. Many people, kids at school, always tried to take advantage of his kindness. Karim may not have always been the best judge of character, but he always had good intentions.

For the last two years of high school I was our high school football captain, and everyone looked up to me and respected me. The way they looked up to me, I looked up to Karim. When Karim was arrested, his friends banded together and made shirts that read, "#TEAMKARIM". His true friends know him as the kindest most sincere, and genuine friend anyone can wish or hope for. His true friends and family here love him and miss him dearly. I'm sharing this in hopes that you can know how much Karim means to me.

Karim is one of the most honest, straightforward, and hardworking people I know. He has never lied to me or been misleading. He has always been honest and completely truthful with me. He possesses everything you want in a best friend.

Last year for Christmas, Karim gave to my family a Christmas ornament for our Christmas tree. The ornament was a small picture frame with a picture of myself, Karim, and my fiancé. I never asked anything of Karim, but he would go out of his way to make sure I understood how much he valued our friendship. He did the same for his other close friends. As an example of this, near the beginning of this year Karim helped our friend Anthony Kyrkos when Anthony's mom was dying from a chronic illness. Karim would go to Anthony's house and be with him like glue to offer support and comfort. Karim was there to help out any way he could.

Karim has been a big part of my life. He has been there for the most important days of my life that make life worth living. One of my favorite memories is when he came to the hospital to welcome my daughter into this world. He was the first of my friends to take time out of his day to visit and hold my daughter for the very first time. He stopped everything that he was doing to come to the hospital. Karim was there within an hour. Karim means the world to me. I want Karim to be the best man at my wedding.

Since high school, Karim and I would hang out together once or twice a week, I really miss those times together. He was always there for me and whenever I needed him, he was always capable in dropping whatever he was doing to come see me. I know Karim is a good person and I hope you will be lenient in sentencing him. I will miss having him in my life and I want several more memories with him.

Ex. H, bates 19-20.

James' father Dave Smith describes Mr. Baratov's positive influence and impact those around

him, and in particular, on his son:

My youngest son, James Smith has been friends with Karim for the past 9 years including their time together in Ancaster High School. During these 9 years Karim has impressed me with his generosity, his talents, and his leadership qualities among his friends, including my son James. For example, Karim was always willing to help even when there was heavy grunt work involved. I was called in by Adrian Zahari, a real estate agent with Home Lite Professionals, because he needed some advice on some structural and plumbing that Karim and Adrian were working on. I was surprised on how hard Karim had been working on this project during this tear-out and rebuild project. Karim was not being paid for this project because he was volunteering to help. Karim had a very positive attitude towards the project. I have always known Karim to be a wonderful, caring, and giving person.

Karim Baratov often treated James to finer restaurants that my son could never afford. James would also treat Karim to small dinners that he could afford. Karim would always welcome his gesture openly. Karim was there whenever his friends like my son James needed him. Humility could have been his middle name.

Sometimes when I would see Karim it would be at our family parties for my grandchild or my son. Karim would always be there helping before the party would start and be one of the last one there at the end of the day helping clean up. One of many examples was for my granddaughter's baby shower after her baby blessing.  He is considered one of the family. He would be and is greatly missed at all our future family events. All life experiences are short and must be cherished. Karim is a big part of our family and is beloved by our whole family.

The point is, Karim does not have an evil bone in his body. He is a young man whose talents got the best of him and I think that justice would be better served by a positive solution that benefits all sides rather than putting a talented kid in jail.

Ex. H, bates 21-22.

Natalia Boniowski, who has known Mr. Baratov for the past two years through her fiancé, writes about the times they have spent together as a family:

Since I have known Karim, I have had the pleasure of his friendship and kindness. Once or twice each week since I have known him we have shared family dinners bonfires, and game/movie nights. Karim is a great family guy. He cares sincerely for all his friends. Karim was never the type to show off any of his belongings, he is very warm hearted.

During my pregnancy Karim had no problem coming to my baby shower, even if it meant he was going to be one of the only men attending. One of my favorite memories was the day I delivered my daughter into this world, he came to visit right away. Other than close family Karim was the very first to see her and hold her. After having my daughter, Karim realized how hard I was

struggling with trying to get back in shape. He offered me tips and advice about health and fitness. If there was any advice to make someone's life better, he would freely share it with genuine love and brotherly kindness. Karim was always nice to everyone.

"Generous" doesn't come close to describing how much Karim gave of himself to his friends and family. It wasn't about money. We never talked about money or anything of that nature. But Karim would give his time. He would spend time with each of his friends, to listen to them, and he would spend his time helping them. When he came over to my mom's house for family birthday parties and events Karim would show up early to help set up. Karim would also help clean up after the parties. Karim was always the guy everyone loved being around because of how much he cared for everyone and tried to make their day better. He was a positive energy. I only have good thoughts and memories towards Karim. It was his time he gave to us.

Karim encouraged us to invite people to our gatherings whom he didn't know, and encouraged us even to bring them over to his house uninvited. Karim opens his heart to everyone and would do his best to make anyone new that we invited to our gatherings feel more than welcome to be there. No one ever felt left out when Karim was around. Karim has a genuine interest and brotherly love for everyone he meets. He gives people the benefit of the doubt.

Karim treated us like family, and to us he was family. We have no blood relations, but he was like a big brother that we could talk to anytime. We not only got along well, but sincerely enjoyed each other's company.

Even though I have only known Karim for a few short years, it was not enough. Our friendship has so much more to come. I miss seeing him as frequently as I did. There is so much good in the world he can do and I hope Your Honor is able to see that too.

Ex. H, bates 23-24.

Shivan Dosky, who has known Mr. Baratov for the past six years, "kindly ask[s] [the Court] to count [his] voice before [Your Honor] decide[s] his sentence." Ex. H, bates 25. Mr. Dosky explains that Mr. Baratov has helped him on many occasions in the past. *Id.* When Mr. Dosky's car was in the shop Mr. Baratov would drive him to work. When there was a snow storm, Mr. Baratov would help shovel Mr. Dosky's driveway. *Id.* He writes, "[i]n my point of view, Mr. Baratov is a type of person who would give the shirt off his back to make you happy. In my six years of knowing Mr. Baratov, I have to say, that there had not been a time that he ever let me down.  Mr. Baratov is very educated,

smart, kind and very gentle person. Mr. Baratov and his family are one of the best neighbors that I have ever had. Him and his family are known in our community as very respectful people." *Id.*

Lucas Prominski, a close friend of Mr. Baratov's who owns his own insurance company in Hamilton, attributes his success to Mr. Baratov:

> In January of 2015 I met Karim through a mutual friend in the car community. Karim and I had heard about each other previously but just hadn't had the chance to formally meet. Once we did meet, I was welcomed with open arms. Instantly we clicked. From then on, there was no looking back on an amazing friendship. Speaking nearly every day about various topics, cars, insurance, investments, and of course girls. I wish I had known Karim for a longer time as he is probably one of 5 true friends that I have had over the course of my lifetime. Nearly every single day he asked how my day was, genuinely caring.
>
> Karim showed me more respect as a person than most of my relatives would, he would always include me in plans and invite me to events, and it truly made me feel included. Family is family, regardless if it's a blood relative or not - I have and always will think of Karim as family. His genuine care for my wellbeing, inclusiveness, motivation, and always being there if I just needed someone to chat with, has meant more to me that I can explain in one letter. I have not told anyone this in the past, but if I could put a number on it - I would say that Karim was 90% my influence and inspiration into going into business for myself. If it wasn't for him I would not be in the position that I am today. I remember last July we had a conversation about it, and he asked "why don't you just open your own insurance place?" From that day on there was really no looking back - that one single question is the sole reason as to where I am today. Once I took Karim up on that question, he was motivating me more and more to do it. Instead of asking how my day was, he would ask how things are going with the planning.
>
> If it wasn't for Karim, my 7 employees would still be at jobs they hated, making 40% of the money they do now, and not contributing all they can to the economy. Wherever Karim went he had a sort of influence in the car community and he did his best to help me grow my business. At car events he would always say "you need to call my insurance guy" within the first 5 minutes of talking to someone. I remember him literally shouting at one point during an event, "everyone needs to get insurance from Luke". Never once did he ask for anything in return from me - he just genuinely cared. I am and always will be indebted to Karim for everything he has provided me - whether it was the motivation to open my own business, the contacts he helped me make to help me succeed, or the marketing he did for me out of his own good nature - he even paid a company on Instagram to market my insurance business to 25,000 people. Never did I have to pay for that, never did I ask him to do that, he did it on his

own free will and on his own dime just because he genuinely cared about my success.

Karim is probably one of the most caring and loyal people that I have ever had the pleasure and honor in calling a friend. I am truly thankful for meeting him and I know we will be friends for the rest of our lives. No matter the situation, I will always be there for Karim as he was for me and will be in the future.

The only thing I have left to say about Karim is "Thank you", regardless of what he has done - he is and always will be family to me, as without him, I would be slaving at a job I hated and wouldn't be as nearly as successful as I am now - and that is thanks to nobody but him.

Ex. H, bates 26-27.

The outpouring of both familial and community support for Mr. Baratov cannot be overlooked as a critical indication that Mr. Baratov will have the direction and network that is required for full rehabilitation. Mr. Baratov has fully accepted responsibility, acknowledged his wrongdoing, and suffers great remorse. His self-reflection and acknowledgment is illustrated by his PSR interview in which, rather than refuse to speak about the offense, he fully confessed to his conduct. PSR ¶24.

The individual that now comes before Your Honor to be sentenced is a 23 year-old young man who is a valued member of his family and community. He is a warm, inviting, kind, thoughtful, and generous individual who is loved by many. The outpouring of support in the form of letters from friends and family for Mr. Baratov speaks volumes about his good character. Each of these individuals are fully aware of Mr. Baratov's criminal conduct but write to the Court to shed light on the person he is beyond this case.

Mr. Baratov is a young, brilliant, first-time offender whose entrepreneurial ambitions were misguided at such a young age.  The greater good will be served by sentencing Mr. Baratov to a sentence below the guidelines.  Such a sentence achieves the goals of general deterrence and respect for the law while giving Mr. Baratov the opportunity to begin a new life and use his intelligence for the greater good.  We submit that Mr. Baratov can offer much more to society from within his community than in prison.

## III.

## CONCLUSION

In light of the foregoing, Defendant respectfully requests the Court impose a sentence of 45 months, 3 years supervised release, and no restitution.

Dated:        New York, New York
              April 17, 2018

                                        __s/Andrew Mancilla__
                                        Andrew Mancilla, Esq.

                                        __s/Robert Fantone__
                                        Robert Fantone, Esq.

cc:      Jeffrey Shih (via ECF)