**Pages 1 - 25**

                      UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,            )
                                 )
   VS.                           )       **NO. C 17-00103-4 VC**
                                 )
KARIM BARATOV, et al.,           )
                                 )
            Defendant.           )
_____)

                              San Francisco, California
                              Tuesday, April 24, 2018


                      **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                      Alex G. Tse
                      Acting United States Attorney
                      450 Golden Gate Avenue
                      San Francisco, CA  94102-3495
                      (415) 436-7478
                 **BY:  JEFFREY L. SHIH**

For Plaintiff:
                      United States Department of Justice
                      National Security Division
                      Counterintelligence and Export
                       Control Section
                      600 E Street, NW
                      Washington, DC  20530
                      (202) 233-0793
                 **BY:  SCOTT K. MCCULLOCH**


Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1  **<u>APPEARANCES</u>:**

2  For Defendant:

3                      Mancilla and Fantone, LLP
                    260 Madison Avenue, 22nd Floor
                    New York, NY  10016

4                      (646) 225-6686
                    (646) 55-0269 (fax)

5            **BY:  ROBERT M. FANTONE**
               **ANDREW MANCILLA**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Tuesday - April 24, 2018**                    **10:58 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Counsel in the Baratov matter can step |
| 5 | forward, and I will call the case when he is present in court. |
| 6 | Calling Case Number 17-CR-00103, USA versus Karim Baratov. |
| 7 | Counsel, please state your appearances for the Record. |
| 8 | **MR. MANCILLA:**  Good morning, Your Honor. |
| 9 | **THE WITNESS:**  Andrew Mancilla, colleague |
| 10 | Robert Fantone. |
| 11 | **THE DEFENDANT:**  Good morning. |
| 12 | **MR. SHIH:**  Good morning, Your Honor.  Jeff Shih, |
| 13 | United States.  With me here is also Scott McCulloch, from the |
| 14 | Department of Justice National Security Division. |
| 15 | **MR. MC CULLOCH:**  Good morning. |
| 16 | **MS. LIBBY:**  Good morning, Your Honor.  Emily Libby, |
| 17 | with the Probation Office. |
| 18 | **THE COURT:**  Good morning.  Okay.  So if I could start |
| 19 | with -- I guess it's Mr. McCullough.  Are you presenting today? |
| 20 | **MR. MC CULLOCH:**  Yes, Your Honor. |
| 21 | **THE COURT:**  So let me start with you.  I have a |
| 22 | couple of concerns about this case and this sentencing, and |
| 23 | they're related concerns.  The first is that it seems as if an |
| 24 | impression has developed that Mr. Baratov is the Yahoo! |
| 25 | mega-hacker.  He is not the Yahoo! mega-hacker.  Correct? |

PROCEEDINGS 4

1          **MR. MC CULLOCH:**  Correct, Your Honor.

2          **THE COURT:**  Okay.  So one concern I have is that the

3    sentence that the Government is requesting for Mr. Baratov --

4    it relates to the fact that he's been caught up with a

5    co-defendant, who apparently was the Yahoo! mega-hacker.

6    That's one concern I have.

7        The related concern that I have is that -- and just to be

8    clear, according to the Government, Mr. Baratov not only was

9    not the Yahoo! mega-hacker, but did not have any involvement in

10   the conspiracy to conduct the Yahoo! mega-hack.  Correct?

11         **MR. MC CULLOCH:**  He was involved with the conspiracy,

12   Your Honor, with -- in the sense that he was taking the fruits

13   of the Yahoo! hack, and basically working for the same people

14   who were hacking Yahoo! in order to accomplish the goals of the

15   conspiracy.

16         **THE COURT:**  Right.  He had a client.  He had a

17   client?

18         **MR. MC CULLOCH:**  He had a client.

19         **THE COURT:**  And the client was involved in the Yahoo!

20   mega-hack, according to you; but Mr. Baratov, himself, was not

21   involved in the Yahoo! mega-hack.  So what you're saying is

22   that somebody who was involved in the Yahoo! mega-hack paid

23   Mr. Baratov money to do some other hacking job?  Is that what

24   you're saying?

25         **MR. MC CULLOCH:**  Correct, Your Honor.

1        **THE COURT:**  And you're saying that that's the way in

2    which he was involved in the Yahoo! mega-hack?

3        **MR. MC CULLOCH:**  Yes.

4        **THE COURT:**  So in other words, he was not involved in

5    the Yahoo! mega-hack.  Correct?

6        **MR. MC CULLOCH:**  Exactly.  We're not saying he was in

7    Yahoo!, stealing things from Yahoo!.  We're not saying that.

8        **THE COURT:**  Okay.

9        **MR. MC CULLOCH:**  We're also not arguing that plays up

10   his Sentencing Guidelines in this case, either.

11       **THE COURT:**  Okay.  I understand.

12     So the other concern I have is that the Defense identified

13   these three cases where hackers were sentenced.  Right?  And

14   they received significantly lower sentences than you are asking

15   for Mr. Baratov, and they received significantly lower

16   sentences than Mr. Baratov is asking for himself.  Right?

17       **MR. MC CULLOCH:**  Correct, Your Honor.

18       **THE COURT:**  And it strikes me that in the universe of

19   hacking crimes, Mr. Baratov's criminal activity was quite

20   serious.  I mean, I think all hacking is serious, but

21   Mr. Baratov's conduct falls on the serious side of the range.

22       **MR. MC CULLOCH:**  Mm-hm.

23       **THE COURT:**  And therefore, he likely deserves to be

24   given a more severe sentence than your typical hacker; but on

25   the question of how much more severe, I'm not satisfied with

1   the Government's presentation.

2      When I read Mr. Baratov's Sentencing Memo, and saw that

3   Mr. Baratov pointed to these other three cases where hackers

4   were sentenced to something much lower than what the Government

5   is seeking for Mr. Baratov, I was expecting the Government to

6   come back and say, *No, no, no.  This is -- you know, the*

7   *sentence that we're seeking is within the range of normal for*

8   *somebody who committed crimes like this.  And here some other*

9   *examples.  Here's a guy from New Jersey who got sentenced to 10*

10  *years for committing similar crimes.  Here's a guy from Florida*

11  *who got sentenced in Federal Court to eight years for*

12  *committing similar crimes.*

13     I didn't get anything like that from you.  And so I am not

14  sure that I feel equipped to make a fully informed decision

15  right now on the appropriate sentence for Mr. Baratov.

16     You know, in a drug case or a felon in possession of

17  firearms, I mean, we sentence people for those crimes all of

18  the time.  And so we judges have a very good sense of what, you

19  know -- whether a proposed sentence falls within the range.

20     It's not often that we sentence somebody for crimes like

21  this.  And I think that I need a better education, perhaps from

22  both sides and from the Probation Office, on where this

23  proposed sentence falls within the range of sentences that

24  hackers are getting around the country in Federal Court for

25  similar crimes.

PROCEEDINGS

1      And, in other words, I'm concerned that the sentence the

2  Government has proposed may result in an unwarranted sentencing

3  disparity at the expense of Mr. Baratov, and that it may

4  somehow be related to the fact that this case is generating

5  headlines about the Yahoo! hack and about Russians.  Right?  So

6  I think I need more from the Government.  I don't think I would

7  be comfortable handing down the kind of sentence that the

8  Government is requesting, without receiving a stronger

9  justification from the Government for it.

10          **MR. MC CULLOCH:**  Okay.

11          **THE COURT:**  I'm not sure I'll ever be comfortable,

12  but I certainly am not now.

13          **MR. MC CULLOCH:**  Of course, to your first question, I

14  should point out that Mr. Shih and I will cover a few things to

15  Your Honor's questions; but on this point, you know, that's --

16  you're correct that this is the kind of case that the courts

17  don't see very often.  This is not something like a narcotics

18  case, where you can point to huge numbers of cases, sort of

19  array them on a spectrum, and figure out where exactly in that

20  spectrum the defendant falls.

21          **THE COURT:**  What can you tell me now about the number

22  of similar cases that are out there; over the last ten years,

23  the number of sort of similar hacking offenses, and what the

24  sentences were for those offenses?

25          **MR. MC CULLOCH:**  So it's hard to give you.  And I

1    don't have a number, is the answer.  I don't have something

2    where I can tell you -- say, *This is the number over the last*

3    *ten years*.

4         There aren't huge numbers.  And obviously every case --

5              **THE COURT:**  I'm sorry.  They are not huge numbers?

6              **MR. MC CULLOCH:**  There are not huge numbers of cases

7    that have been sentenced.

8         And when they're sentenced, the harm is often different in

9    these different kinds of cases.  So looking to that for

10   guidance is going to be difficult anyway.

11        I mean, the vast majority of the cases, as I understand

12   them, are sentenced under 2B1.1 for hacking cases are --

13   they're credit-card-related cases, or people think it's a point

14   of sale, or wherever else they're getting these credit-card

15   numbers.  They're turning around and selling them.  It's sort

16   of like a more classic economic loss under 2B1.1.

17        I mean, the point that the cases the Defense points to or

18   that the Government points to, as well, stand for -- is that

19   courts have generally looked to the Guidelines in the same way

20   that they do for 2B1.1 check cases in general, understanding

21   that when it comes to a case like this, you're not dealing with

22   the same kind of 2B1.1 issues that might be -- that some courts

23   have had raised or have been challenged by in terms of:  Is

24   there a connection between loss amounts and, you know, criminal

25   culpability in the way that the Court can extrapolate to what

PROCEEDINGS

1  the appropriate sentence is under 3553(a)?

2       Here, the Court can sort of benefit from the fact that we

3  know the amount of harm to the victim caused.  You know, we

4  have guidance from 2B1.1 as to how historic thinking about

5  that, in terms of trying to put a proxy on that harm, and work

6  with the Guidelines in a way that's actually meaningful, and

7  gives the Court some sense for, you know, where the Sentencing

8  Commission thought that people committing these kinds of

9  crimes, you know, ought to wind up when it comes to the actual

10 sentencing table.

11      And then we have enough information, understanding what

12 the defendant's own sort of state of mind is from his

13 statements, from his own papers, and from the proffer that he

14 conducted with the Government; what he was trying to do when he

15 looked at these requests that were coming in from his client;

16 whether he was concerned or not concerned with the harm that he

17 was causing to the victims on behalf of the criminals that were

18 specifically targeting them, asking him, saying, *Look.  I want*

19 *this person's -- I want access to this person's e-mail account,*

20 *everything else that goes with that, from the account to every*

21 *other account and part of their life that that gets you into*;

22 not from some random person, which is what almost all of the

23 other cases that we'd be able to point you to would look like,

24 you know, where you have bulk activity, where people go in, and

25 they steal every credit-card number they can find, and they

turn around and resell it; or they steal access to a large

database of a company.  They get in and steal every e-mail

account.  They turn around and sell it on some kind of a

criminal market.

What we have here is really something much more nefarious

than that.  And I don't think you're going to find any cases

out there --

**THE COURT:**  Okay.  So let's --

**MR. MC CULLOCH:**  There's none quite like this.

**THE COURT:**  Wait.  Let me make sure I understand.

You're saying it's more nefarious than hacking into a company,

stealing everybody's personal information, and then selling

that on the market?

**MR. MC CULLOCH:**  Correct, Your Honor.

**THE COURT:**  This is more nefarious than that?

**MR. MC CULLOCH:**  I think it is.

**THE COURT:**  Okay.  How?

**MR. MC CULLOCH:**  Because -- the difference really is

with -- those resale cases, where a criminal basically gets

access to something that they're not supposed to have access

to, and turns around, and resells it, there is not the same

understanding of targeted harm towards the victim.

**THE COURT:**  Well, you're turning around and selling

it.  And presumably, in turning around and selling it, you can

assume that there will be targeted harm towards victims.

**PROCEEDINGS**

1          **MR. MC CULLOCH:**  I'm not at all arguing that's not

2   serious and not nefarious in its own right.

3          The difference here is that it's not a bulk sale, and

4   you're not taking huge numbers of whatever you happen to get

5   access to, and sort of trying to profit from it.  Somehow

6   somebody might pay for it.  Who knows what portion of those

7   actual victims would ultimately be targeted; what use that

8   would be put to?

9          Here, every single request that comes in from

10  Mr. Baratov's clients is, *I want access to this person; this,*

11  *you know, specified individual account*.

12         I'm not aware of any other case where someone has dealt

13  with something like that, and the kind of lack of care as to

14  the harm that results to people that he knows are being

15  targeted specifically.  So, you know, we could sort of canvass

16  the relatively small universe of cases that are out there to

17  look to, but nothing is going to give the Court the guidance

18  that I think you're looking for.

19         **THE COURT:**  Even that would be helpful.  I mean, if

20  you -- you know, people who have been sentenced --

21         We can have an argument about how much more serious this

22  conduct is than stealing a bunch of personal information of,

23  you know, 10,000 people from a company, and then turning around

24  and selling it --

25         **MR. MC CULLOCH:**  Mm-hm.

1     **THE COURT:**  -- so that 10,000 people's personal

2  information could be specifically targeted by people who are

3  interested in it.  We could have that discussion, but I feel

4  like you haven't laid the groundwork for that discussion yet by

5  responding in a meaningful way to the Defense's assertion that

6  the sentence you're seeking, you know, for Mr. Baratov is way

7  out of whack compared to most hackers.  And so I feel like

8  we're not ready even to have that discussion, without getting

9  that from you.

10     Another question I had is, you know, you talk about, you

11  know, the number of victims in this case.

12     And, you know, I think it sound like it's undisputed that

13  the vast majority of victims that we're looking at for purposes

14  of the Guideline calculation were people who live in Russia who

15  were victimized by somebody who was in Canada.  And so another

16  question I have is, you know, *How does that affect the analysis*

17  *here?*

18     Is there anything legally inappropriate about including

19  that, you know, in the Guideline calculations; including losses

20  attributed to those people in Guideline calculations?

21     **MR. MC CULLOCH:**  There is not, Your Honor.  And, you

22  know, we would highlight -- I understand that's the argument

23  that the Defense makes.

24     **THE COURT:**  Well, they actually didn't make that

25  argument.  They didn't -- I mean, I'm --

1          **MR. MC CULLOCH:**  It's implicit in the statements.

2    Exactly.

3          **THE COURT:**  Yeah.  I mean, it sort of bubbles under

4    the surface --

5          **MR. MC CULLOCH:**  Yes.

6          **THE COURT:**  -- of their brief, but I'm asking if

7    there's any actual, like, legal proscription on considering

8    that loss by those people.

9          **MR. MC CULLOCH:**  There is not.  You know, we looked

10   when we saw that.  And I think that's why it sort of bubbles

11   under the surface, rather than being argued explicitly.

12      I mean, the flip side of that, as well, is we don't know

13   that all of these victims were in Russia.  Obviously, some

14   couple thousand of them were clients of US ISPs, which is a

15   significant harm to the United States, in and of itself.

16   People speak Russian in the United States.  We know that many

17   of the victims, beyond the actual Russian speakers, were

18   actually in the United States, and targeted by the FSB for that

19   reason.

20      You know, the other point is this is -- we don't want to

21   be in a position where we're basically doing the same thing

22   that the FSB is doing, and sort of counting harm outside of the

23   country as something not really of great concern, and

24   therefore, it's fine to hire these people to protect them.

25   They can go hack anywhere else in the world, as long as you

1  don't hack in the United States, as long as they sort of don't

2  play around in Russia.

3      That is just not something that we do.  So, you know, we

4  treat all of this as very serious.

5      And, you know, as to the specific question of whether it's

6  legally inappropriate -- it is not.  And the statute, as

7  Mr. Shih is pointing out, is extraterritorial explicitly, by

8  Act of Congress; but also it, you know, asks a sort of softer

9  question as to whether it ought to weigh into the Court's

10  calculation of an appropriate sentence.  The answer to that is

11  no, as well.

12          **THE COURT:**  Okay.

13          **MR. MC CULLOCH:**  Just to address your other point, if

14  it's okay, before you move on, on whether the Yahoo! hackers

15  were playing into the difficulty in assigning an appropriate

16  level of culpability under the Guidelines --

17          **THE COURT:**  Sure.

18          **MR. MC CULLOCH:**  You know, it is not in this case.

19  You know, Mr. Baratov's codefendants were charged with economic

20  espionage, you know.  He was not.

21      You know, they were -- were they here, assigned with, you

22  know, vastly higher loss amounts and Guideline ranges based on

23  their participation directly in the Yahoo! hack, which he is

24  not being assigned --

25      The only thing that Mr. Baratov is facing before the Court

1   today is, you know, in terms of his Guideline calculation, the

2   specific harm that he caused to his own victims, and the manner

3   that he went about it.

4        So there's no cross-pollination between, you know, what he

5   did at Yahoo!, and sort of the challenge before the Court of

6   appropriately assigning culpability, and of the sentence

7   effective under 3553(a).  All we're looking at here, when you

8   look at the Guideline range, is:  What exactly did Mr. Baratov

9   do; and how did he do it; who did he do it to; and how many

10  people?  That's where the Guideline Range comes from.

11       And the cases that decide it --

12            **THE COURT:**  And just, if I remember correctly,

13  nobody's -- nobody's disputing what the Guideline Range is in

14  this case.  Right?

15            **MR. MC CULLOCH:**  Correct, Your Honor.

16            **THE COURT:**  I mean, both sides agree on what the

17  appropriate guideline calculation is.  Right?

18            **MR. MC CULLOCH:**  And Probation, as well, Your Honor.

19  Yes.

20            **THE COURT:**  So the real question is whether the

21  sentence that the Government is seeking is greater than

22  necessary to serve the purposes of the sentencing statute.

23            **MR. MC CULLOCH:**  Correct.

24            **THE COURT:**  And part of that is looking at whether

25  there's an unwarranted sentencing disparity here.  And so

1  that's the issue I'm concerned about.

2      And, you know, I mean, if you want to proceed with

3  sentencing now, you know, I'm fine with that; but you know, as

4  I said, I'm not comfortable with the Governments' proposed term

5  of custody, without getting more information on how other

6  somewhat similarly situated defendants are being sentenced

7  around the country.  So do you want to submit further briefing

8  on that, and continue the sentencing hearing?

9  (Discussion off the record.)

10      **MR. MC CULLOCH:**  So, I mean, the concern from the

11  Government, Your Honor, is that it's -- we're certainly not

12  hiding the ball, in terms of knowing some very useful case for

13  the Court, and not providing it.  I know that's not what you're

14  suggesting.  It's just that, looking at the facts of this case,

15  you know, if we had seen other cases that we thought were, you

16  know, informative in terms of the appropriate sentence, we

17  would have proposed them to the Court as another guidepost to

18  look at.  If there are other cases that are out there on that

19  point --

20      **THE COURT:**  Well, but you just made reference to

21  cases where somebody hacks into a company, steals a bunch of

22  data, and cells it in bulk to -- you know, on a criminal

23  market.

24      **MR. MC CULLOCH:**  Mm-hm.

25      **THE COURT:**  You didn't talk about any of those cases

1  in your brief.

2         **MR. MC CULLOCH:**  We talked about a couple of them,

3  Your Honor -- the Massachusetts case, and the *Seleznev*

4  matter -- both of which were cited in the Government's Response

5  to the Sentencing Memo.  Those are both credit-card-fraud cases

6  of a similar nature, where you're operating under Guideline

7  2B1.1 with sort of the application --

8         **THE COURT:**  What were the sentences in those?  What

9  was the defendant sentenced to in those cases?

10        **MR. MC CULLOCH:**  In the first, 20 years.  And in the

11 second, 27 years.

12        **THE COURT:**  Okay.  And where is that in your brief?

13        **MR. MC CULLOCH:**  It's in the response to the

14 disparity issue that the Court was addressing, which is

15 footnote 7 in the Response.  It's on page 6, Your Honor.

16        **THE COURT:**  Footnote 7.  That might be why I didn't

17 see those cases.

18     (Laughter in the courtroom.)

19        **MR. MC CULLOCH:**  And just -- Your Honor, just to make

20 the one other point, we're not suggesting, as we note here in

21 the footnote, that those are the appropriate guideposts for

22 Mr. Baratov, because the defendants in those matters harmed far

23 more victims that he did, which is why the Guideline ranges

24 went up where they did.  They really stand for the proposition,

25 as to do all three cases that the defendant cites, that where

1  courts have tried to figure out how do you weigh harm to

2  victims into the Guidelines to come up with an appropriate

3  sentence, that the best rubric is the policy determination in

4  the Sentencing Guidelines, which is deciding the proxy value of

5  $500 per accessed account.

6      And sort of getting to a place in the guidelines where you

7  look at that, and sort of have that stand in for the harm to

8  the victims, although we would submit that in this case that

9  really understates the harm, especially where you have this

10 much broader access to victims' lives, and it's being

11 specifically targeted by a criminal that wants that

12 information, rather than these sort of bulk card cases.

13     But they really -- all of the cases -- the couple that

14 we've cited, as well as a few that the Defense stands for -- in

15 none of those cases did the Court, you know, just totally throw

16 out the Guidelines and say, *Look*. *We don't know what to do*

17 *with these Guidelines here.*

18         **THE COURT:**  Right.  You have a discussion about

19 whether to use the Guidelines or not.  And you talk about --

20 you say that we shouldn't use the shadow guidelines.

21     Let me just ask you now.  Do you want to take a shot at,

22 like, doing a canvassing of cases that are arguably similar or

23 somewhat similar, to give me a better sense of the ranges that

24 people get -- the sentencing range that people get for crimes

25 like this; or do you want to proceed now?

**PROCEEDINGS**

1   (Discussion off the record.)

2            **MR. MC CULLOCH:**  No.  I mean, the other cases that

3   we've seen have all had aspects to them that just made them

4   difficult to weigh in; cooperative defendants cooperating, or

5   there's just something about them that made them seem not

6   useful.  So --

7            **THE COURT:**  Okay.

8            **MR. MC CULLOCH:**  -- you know, if the Court directs

9   us, obviously, we'll do whatever the Court asks.

10            **THE COURT:**  Well, but so what you're saying is you've

11   taken your best shot at --

12       The defendants have made that argument that the sentence

13   that you are proposing would create unwarranted sentencing

14   disparity, because somewhat similar offenders have been

15   sentenced to much lower terms.

16       And what you're saying is you've taken your best shot at

17   responding to that?  You don't have anything more that you want

18   to submit on that?

19            **MR. MC CULLOCH:**  I mean, the only --

20            **THE COURT:**  You would rather proceed with the

21   sentencing today?

22            **MR. MC CULLOCH:**  I mean, if the Court is of the view

23   that the defendants in those cases that the defendant points to

24   here are similar, then it may be that we need to brief that

25   further.  I mean, our view would be the only way in which

1  they're similar is that they were all hackers, you know; but

2  the similarity basically ends there.

3       You had one who hacked something like 30 accounts, and it

4  was sort of for kicks, rather than to really do anything more

5  nefarious to the victims.

6       You have one that hacked about 158 counts.

7       One -- I think it was 50 -- I'm sorry.

8       600 was the last one.

9       You have no one who caused this sort of widespread harm

10 that the defendant did, or in that same nefarious manner that

11 we discussed.

12          **THE COURT:**  I mean, one of the defendants was doing

13 it for sexual gratification.

14          **MR. MC CULLOCH:**  Exactly, Your Honor.

15          **THE COURT:**  And, I mean, that sounds like a pretty

16 significant harm to me, if you're hacking into people's

17 accounts to -- you know, for sexual gratification.

18          **MR. MC CULLOUGH:**  Absolutely, Your Honor.

19      And, I think, stole some naked pictures from some people.

20 There are other aspects that were very disturbing.

21      I mean, the point that we would make is that that's one --

22 one of the things that Mr. Baratov claims may have been done to

23 his victims.  Who knows?  I mean, he didn't ask.  There was no

24 attempt to mitigate that harm.  We know there was not sort of

25 random access; but rather, you know, specifically targeted.  So

1  it could have been -- that could have been much worse.  You

2  know, there's just no way to know precisely.

3      **THE COURT:**  Okay.  Well, what I'm going to do -- I

4  mean, I don't -- you know, I'm not sure I'm going to get

5  anything very helpful from the Government, in light of this

6  discussion, but at a minimum I'm going to continue the

7  sentencing hearing so that I can conduct my own further

8  investigation of it, and ask Probation to conduct a further

9  investigation of, you know, where the Government's proposed

10  sentence falls in the range of sentences that, you know,

11  somewhat similar criminal conduct receives.

12      And if the parties want to file further briefs on that,

13  they can, although it sounds like the Government's not

14  particularly interested in doing so.  So maybe I'll just get my

15  information from the Probation Office.

16      **MR. MC CULLOCH:**  Your Honor, if it's helpful to the

17  Court, absolutely we'll file whatever's out there, so that the

18  Court can look for it and decide for itself whether those are

19  helpful data points.

20      **THE COURT:**  Okay.  So I'm going to ask the Government

21  to give me a fuller assessment of the cases out there where

22  hackers have been sentenced in Federal Court; and where this

23  falls in the range -- where its proposed sentence falls in the

24  range compared to those other cases.  And I'll ask the

25  Government to file a brief within 14 days.

PROCEEDINGS

1          **MR. MC CULLOCH:**  Yes, Your Honor.

2          **THE COURT:**  And the defendant can respond within 21

3    days?  I'll give the defendant an additional 14 days after the

4    Government files its Supplemental Sentencing Memorandum.

5          **MR. FANTONE:**  Okay.

6          **THE COURT:**  And in the meantime, I'll ask Probation

7    to maybe get in touch with the Sentencing Commission, and see

8    if Probation can get some data from the Sentencing Commission.

9    If we get anything meaningful, I'll share it with you all.

10         And we'll have a further sentencing hearing in -- I don't

11   know -- six weeks, or two months, or something like that.

12         Is that okay?

13         **MR. MANCILLA:**  Your Honor --

14         **THE COURT:**  You want to accelerate it?

15         **MR. MANCILLA:**  -- we would ask for an accelerated.

16   My client's been waiting to be sentenced, to close this case

17   out.  He wants to move on with his life.

18         I think that, you know, if it weren't for the Court's

19   interest in doing further research -- we had brought these

20   cases to the Government's attention back in October, to explain

21   to them why he deserved, you know, a different type of

22   Plea Agreement.

23         As you probably noticed, some of the defendants -- some of

24   the cases that we've cited -- the Government chose not to

25   pursue the aggravated identity theft, which is a consecutive 24

PROCEEDINGS

1  months on top of everything.  And instead they would agree to,

2  say, two months beyond the Guideline Range, which would account

3  for the additional privacy interests that were violated by

4  these defendants who targeted, very much so, just like this

5  case -- or according to them, just like this case -- their

6  victims.

7       The *Seleznev* case is completely inapplicable.  It is

8  $170 million known loss.

9       The case here, the Government has been unable to prove any

10  actual loss.

11          **THE COURT:**  Okay.  Well, I'm happy to accelerate the

12  process --

13          **MR. MANCILLA:**  Yeah.

14          **THE COURT:**  -- to have a shorter continuance of the

15  sentencing hearing, but since your client is in custody --

16          **MR. MANCILLA:**  Okay.

17          **THE COURT:**  I mean, he's going to be in custody,

18  regardless, because --

19          **MR. MANCILLA:**  Unless Your Honor wants to give him

20  time served.

21          **THE COURT:**  Even the sentence that you've requested

22  is --

23       And I can't give him time served, just so you know.

24       So, you know, it's just a question of where he will be in

25  custody.  Right?

PROCEEDINGS

1    **MR. MANCILLA:**  Is it limited to Tuesdays, Judge?

2    **THE COURT:**  Yes.

3    **MR. MANCILLA:**  Okay.

4    **THE COURT:**  But I'm happy to have a more accelerated

5    schedule.

6    **MR. MANCILLA:**  Could we do the 29th?  And based our

7    briefing schedule, based off of that?

8    **THE COURT:**  29th of?

9    **MR. FANTONE:**  Of May.

10   **MR. MANCILLA:**  Of May.  Sorry.

11   **THE COURT:**  Sure.

12   **MR. FANTONE:**  Is it okay if I double check the date

13   with Mr. Baratov's parents?

14   **THE COURT:**  Sure.  Yeah.  Not a problem.  Take your

15   time.

16   **MR. FANTONE:**  Thank you.

17   **MR. MANCILLA:**  One moment.

18      Would Your Honor be amenable to June 5th?

19   **THE COURT:**  I think I'm not here that week.

20   **MR. MANCILLA:**  Okay.  So I guess we'll see about the

21   29th.

22   **THE COURT:**  We can do the week after, June 5th, if

23   you prefer.  I mean, if you want to check with his parents --

24   **MR. FANTONE:**  The parents are good with May 29.

25   **MR. MANCILLA:**  We'll do May 29th, Judge.

1          **THE COURT:**  Okay.  May 29th.

2      And so why don't we say, then, that the Defendant's

3   Supplemental Sentencing Memorandum is due 14 days prior to the

4   hearing; and the Government's Supplemental Sentencing

5   Memorandum is due -- I was going to say 21 days prior to the

6   hearing, but that's, like, really soon.  Right?

7          **MR. MANCILLA:**  Again, they've had these cases since

8   October.  I think they can have a quick turnaround time.

9          **THE COURT:**  Again, the Government's supplemental

10  memorandum will be due 21 days prior to the hearing.  And I'll

11  just ask Probation to circle back with me on this as soon as

12  you can.

13          **MS. LIBBY:**  Yes, Your Honor.

14          **MR. MANCILLA:**  Thank you, Judge.

15          **MR. FANTONE:**  Thank you, Judge.

16          **THE COURT:**  All right.  Thank you.

17          **MR. MC CULLOCH:**  Thank you.

18      (At 11:27 a.m. the proceedings were adjourned.)

19  I certify that the foregoing is a correct transcript from the

20  record of proceedings in the above-entitled matter.

21

22  *Lydia Zinn*

23  _____  April 25, 2018
    Signature of Court Reporter/Transcriber    Date
24  Lydia Zinn

25